U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET





**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed November 13, 2006**

_____
**United States Bankruptcy Judge**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| JAMES RANDELL HUGHES, | § | CASE NO. 05-82316-SGJ-7 |
|     DEBTOR. | § | |
| | § | |
| | § | |
| THE CADLE COMPANY, | § | |
|     PLAINTIFF, | § | |
| | § | |
| VS. | § | ADVERSARY NO. 06-3264 |
| | § | |
| JAMES RANDELL HUGHES, | § | |
|     DEFENDANT. | § | |

## <u>MEMORANDUM OPINION GRANTING IN PART AND DENYING IN PART MOTION FOR FINAL SUMMARY JUDGMENT</u>

### <u>I.</u>
### <u>INTRODUCTION</u>

Before this court is the Motion for Final Summary Judgment

(the "Summary Judgment Motion") of The Cadle Company ("Cadle") on

Objection to Discharge of Debtor James Randell Hughes and Brief
in Support Thereof and Defendant's Response to Plaintiff's Motion
for Final Summary Judgment (the "Response") and brief in support
filed by James Randell Hughes ("Mr. Hughes" or the "Defendant" or
the "Debtor").  Cadle seeks summary adjudication that Mr. Hughes
is not entitled to a discharge of his debts pursuant to sections
727(a)(3) and 727(a)(4) of the Bankruptcy Code.

This court has jurisdiction of this matter pursuant to 28
U.S.C. §§ 1334 and 157.  This is a core proceeding pursuant to 28
U.S.C. § 157(b)(2)(A) and (I).  This memorandum opinion sets
forth the facts that appear to be without substantial controversy
and the conclusions of law pursuant to Federal Rule of Civil
Procedure 7056.

II.
PROCEDURAL POSTURE

On March 30, 2006, Cadle filed its Original Complaint
Objecting to Debtor's Discharge Pursuant to 11 U.S.C. § 727 (the
"Complaint") asserting that Mr. Hughes is not entitled to a
discharge of his debts pursuant to sections 727(a)(2), (a)(3),
(a)(4), (a)(5), and (a)(7) of the Bankruptcy Code.[1]  On May 5,

---

[1]The Defendant filed his voluntary chapter 7 petition in
bankruptcy on October 5, 2005, so the pre-BAPCPA Bankruptcy Code
provisions apply.  Bankruptcy Abuse Prevention and Consumer
Protection Act of 2005 ("BAPCPA").

2006, Mr. Hughes filed his Original Answer (the "Answer") denying that he is not entitled to a discharge and asserting various affirmative defenses, none of which are pertinent herein. Although Cadle raises several subsections of section 727(a) of the Bankruptcy Code in its Complaint, it seeks only summary adjudication with regard to section 727(a)(3) (for the purported, unjustified failure by the Defendant to keep and maintain financial records) and section 727(a)(4) (for the purported, knowing and fraudulent making of a false oath by Mr. Hughes with regard to his bankruptcy case).

A hearing on the Summary Judgment Motion was held on August 31, 2006, and argument was made by counsel for Cadle and counsel for Mr. Hughes. Also, on August 31, 2006, Cadle filed an Objection to Summary Judgment Evidence of Defendant, objecting to the affidavits of Mr. Hughes and of Melanie Wingo Hughes ("Mrs. Hughes" or "Melanie Hughes"), Mr. Hughes' wife, arguing principally that statements made within the affidavits were incompetent summary judgment evidence. The court denies Cadle's Objection, with the proviso that the court, in considering this matter and in drafting this opinion, has given the affidavits the weight to which they are entitled.

III.
UNDISPUTED MATERIAL FACTS

## A.  Mr. Hughes' Business Background

The undisputed facts are that Mr. Hughes is in the real estate business and has been for over 25 years.  He manages construction and sales of upscale residences for H. Hughes Properties, Inc. ("HHPI"), a business owned by his wife.  He has also been involved in the construction of high-end homes through several business entities for many years.  During the 1980s and early 1990s, Mr. Hughes owned, with his business associate, Gordon Todd, several real estate ventures that were caught up in what has come to be known as the savings and loan crisis of the late 1980s.  As a result, Mr. Hughes' business ventures incurred several millions of dollars in debts, embodied in judgments against them.  Because Mr. Hughes personally guaranteed his business debts, those judgments extended to him personally. Indeed, Mr. Hughes' Schedule F filed in his bankruptcy case shows judgments against him in the approximate amount of $41 million.

## B.  Mr. Hughes' Financial Records (or Lack Thereof)

It is undisputed that Mr. Hughes has, for at least the last fifteen years, operated mostly on a cash basis.  He has not maintained or used a personal checking account, nor has he held credit cards or other accounts at banking institutions.  Mr.

-4-

Hughes asserts by affidavit in support of his Response that he periodically cashes his paychecks from HHPI (his wife's company), and the funds are used to pay his personal expenses, household expenses, child-related expenses such as tuition, and other living expenses. All such living expenses, he asserts, are paid in cash or through the purchase of a cashier's check or money order. Mr. Hughes testified at his continued section 341 meeting on January 24, 2006, the transcript for which is attached as Exhibit 2 to the Andrew Emerson Declaration (the "Emerson Declaration") in support of the Summary Judgment Motion, that he receives a paycheck twice a month from HHPI, and that his take-home pay is approximately $5,000.00 a month. Mr. Hughes asserts in his affidavit in support of his Response that he generally cashes his paychecks from HHPI and places approximately $2,000.00 a month into a drawer at his home. He asserts that he uses the other funds for personal expenses. He and Mrs. Hughes both assert by affidavit that she has access to the funds and often uses the funds to pay monthly expenses for the family. There is no record whatsoever reflecting the monies that have passed in and out of the drawer at home. Indeed, Mr. Hughes testified at his continued section 341 meeting that he does not keep any record of the money he spends in any way. He testified that

since he has no checking account nor any credit cards, no statements for such types of accounts can be produced because they do not exist. Mr. Hughes testified that the financial records that exist for him are his tax returns, some paychecks, and copies of cashier's checks used to pay his children's tuition. These, he asserts, are the only financial documents he has in his possession to turn over for creditor review.

## C. Mr. Hughes' Bankruptcy Disclosures (the Adequacy or Inadequacy Thereof)

Cadle also asserts that Mr. Hughes has failed to disclose certain information in connection with his bankruptcy proceedings, which failures to disclose amount to Mr. Hughes knowingly and fraudulently making a false oath or account within the meaning of section 727(a)(4) of the Bankruptcy Code.

### 1. Business Entities or Ventures With Which Mr. Hughes Has Had Some Level of Involvement

Cadle first focuses on Mr. Hughes' asserting at his section 341 meeting that he had not been an officer, director, owner, or been involved in a major way in a business corporation, partnership, or a subchapter S corporation within the last six years. Cadle points to 4323 Beechwood, L.L.C. ("4323 Beechwood"), a business enterprise in which Mr. Hughes has apparently been involved in some capacity, as evidence that Mr.

Hughes was not being truthful at his section 341 meeting. Cadle notes that Mr. Hughes did not disclose in response to Question 18 on his originally filed Statement of Financial Affairs any interest in 4323 Beechwood. In the Summary Judgment Motion, Cadle references Exhibit 3 to the Emerson Declaration as proof that Mr. Hughes is President and Director of 4323 Beechwood. Exhibit 3 is a copy of a document on file with the Texas Secretary of State's Office reflecting officers and directors of 4323 Beechwood. The transcriptions of Mr. Hughes' initial section 341 meeting held on November 29, 2005, attached as Exhibit B to the Affidavit of T. Rick Frazier filed in support of the Response, reflects that a representative of the United States Trustee's Office asked Mr. Hughes if he was president of 4323 Beechwood, apparently referencing Exhibit 3, and Mr. Hughes responded that his wife's company, HHPI, and a person named Mike Eberhardt owned 4323 Beechwood and that he was just the managing director.

Next, Cadle points to a credit approval summary regarding a loan to HHPI, Exhibit C to the Summary Judgment Motion, which refers to the acquisition of certain real property by Mr. Hughes and a gentleman named Mike Mullen. Mr. and Mrs. Hughes, in their affidavits, both dispute that it was Mr. Hughes who was involved

-7-

in the acquisition of property with Mr. Mullen. They both assert
that it was HHPI or Mrs. Hughes' former business venture with
Nancy Todd, Todd & Hughes Building, Inc. ("THBI") that was
involved in business transactions with Mr. Mullen. Mrs. Hughes
goes on to assert in her affidavit that Mr. Hughes served as
construction manager on the projects with Mr. Mullen.

Cadle also draws this court's attention to two Forms K-1 for
2001 and 2002 regarding Odin-Neptune Partnership, 1997, Ltd.
("Odin-Neptune"), which reflect Mr. Hughes is a limited partner
in Odin-Neptune, Exhibit 8 to the Emerson Declaration, noting
that Mr. Hughes denies being a partner in any venture. Mr. and
Mrs. Hughes in their affidavits both assert that the partnership
interest is Mrs. Hughes' property, not Mr. Hughes',
notwithstanding what the Forms K-1 indicate.

### 2. Omissions or Discrepancies in Schedules or Statement of Financial Affairs

Cadle further points out several times when, in his original
Schedules and Statement of Financial Affairs, Mr. Hughes "failed"
to include certain information, and Cadle complains of various
discrepancies between Mr. Hughes' original Schedules and
Statement of Financial Affairs and his amended Schedules and

-8-

Statement of Financial Affairs. For example, Cadle complains of the failure by Mr. Hughes to identify John A. Evans as Mr. Hughes' bookkeeper. Additionally, Cadle complains of the amendment of certain household expense items on Schedule J, and certain disputed valuations of various of Mr. Hughes' assets.

The affidavits of Mr. Hughes and Mr. Frazier, Mr. Hughes' counsel, assign at least some of the errors in the original Schedules and Statement of Financial Affairs to Mr. Frazier and his staff in filling out the forms. This court takes judicial notice that Amended Schedules and Statement of Financial Affairs were filed by Mr. Hughes and such amendments were accepted by this court. And in so accepting the schedules, this court noted that "[t]here was insufficient showing that [Mr. Hughes] evidenced bad faith in filing such amendment of schedules or that [Mr. Hughes] caused prejudice to creditors by such . . . amendments." *See* Order Denying Motion to Reject Amendments to Schedules, *In re James Randell Hughes*, Case No. 05-82316-SGJ-7, Bankr. N.D. Tex. Feb. 14, 2006). Additionally, with regard to amendments to Schedule J, Mr. Hughes testified at the continued section 341 meeting on January 24, 2006 that his wife, Melanie, pays the bills and that he obtained the list of monthly expenses from her in preparing the original schedules and then he

-9-

consulted her again, in preparing the amended schedule J, after the United States Trustee sent him a letter asking for further details on various items.

None of these items, when viewed in their totality, appear to this court to be in the nature of willfully hiding information or reckless disregard for the truth. At the least, there would seem to be a genuine issue of material fact regarding intent.

## D.  The Post-Nuptial Partition Agreement

Finally, Cadle raises, as some evidence of Mr. Hughes' alleged fraud, a post-nuptial partition agreement entered into by Mr. Hughes and his wife in 1988. Stating the obvious, this post-marital partition agreement was entered into more than 15 years before his bankruptcy petition was filed—hardly an eve-of-bankruptcy transaction. In any event, at the continued section 341 meeting on January 24, 2006, Mr. Hughes testified that because of the uncertain business climate in the late 1980s and, particularly, in connection with the Federal Deposit Insurance Corporation taking over savings and loan associations during that period, and upon the advice of certain attorneys and Mr. Hughes' father-in-law (who is also an attorney), Mr. and Mrs. Hughes decided to enter into a post-nuptial partition agreement. The partition agreement was entered into, in part, so that Mrs.

-10-

Hughes could earn her own income unencumbered by Mr. Hughes'
personal obligations. Mr. Hughes was, in fact, very candid that
they entered into this partition agreement when his businesses
were failing because his family needed a means to earn income.
He was emphatic that they did not enter into the agreement in
order to defraud creditors, but simply did it in order that their
family could survive.

IV.
CONCLUSIONS OF LAW

## A. Legal Standard for Summary Judgment

Summary judgment is appropriate if "the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to a judgment as a matter of law." Fed. R. Civ. P.
56(c). "A summary judgment motion is properly granted only when,
viewing the evidence in the light most favorable to the nonmoving
party, the record indicates that there is no genuine issue as to
any material fact." *Am. Home Assurance Co. v. United Space
Alliance, LLC,* 378 F.3d 482, 486 (5th Cir. 2004). The
materiality of facts is governed by substantive law, and only
facts that might affect the outcome of the suit will preclude
summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

-11-

248 (1986).  The court must review the factual and legal issues

presented in order to make a determination on the Summary

Judgment Motion, and must view those facts in the light most

favorable to the Defendant, the nonmoving party.

**B.  Is there a genuine issue of material fact as to whether Mr. Hughes failed, without adequate justification, to keep and preserve financial records sufficient to allow creditors to examine his financial condition, such that his discharge should be denied pursuant to section 727(a)(3)?**

Section 727(a)(3) of the Bankruptcy Code provides that

"[t]he court shall grant the debtor a discharge, unless the

debtor has concealed, destroyed, mutilated, falsified, or failed

to keep or preserve any recorded information, including books,

documents, records, and papers, from which the debtor's financial

condition or business transactions might be ascertained, unless

such act or failure to act was justified under all of the

circumstances of the case."  11 U.S.C. § 727(a)(3)  "In order to

state a prima facie case under [section] 727(a)(3), the party

objecting to discharge bears the initial burden to prove (1) that

the debtors failed to keep and preserve their financial records

and (2) that this failure prevented the party from ascertaining

the debtors' financial condition.  Though a debtor's financial

records need not contain 'full detail,' 'there should be written

evidence' of the debtor's financial condition."  *Martin Marietta*

*Materials Southwest, Inc. v. Lee (In re Lee)*, 309 B.R. 468, 476
(Bankr. W.D. Tex. 2004) (Clark, J.) (*citing Robertson v. Dennis
(In re Dennis)*, 330 F.3d 696 (5th Cir. 2003); *Goff v. Russell Co
(In re Goff)*, 495 F.2d 199 (5th Cir. 1974)).  If the plaintiff
meets its burden to make that prima facie case, the burden shifts
to the debtor to show that the failure to keep adequate records
was justified under all of the circumstances. *Id*.  The
bankruptcy court has wide discretion in determining the
sufficiency of the records kept and preserved by the debtor.
*Robertson v. Dennis (In re Dennis)*, 330 F.3d 696, 703 (5th Cir.
2003).

     "The purpose of section 727(a)(3) is to give creditors and
the bankruptcy court complete and accurate information concerning
the status of the debtor's affairs and to test the completeness
of the disclosure requisite to a discharge.  The statute also
ensures that the trustee and creditors are supplied with
dependable information on which they can rely in tracing the
debtor's financial history.  Creditors are not required to risk
having the debtor withhold or conceal assets 'under cover of a
chaotic or incomplete set of books or records.'" *Meridian Bank
v. Alten*, 958 F.2d 1226, 1230 (3rd Cir. 1992) (*citing In re Cox*,
904 F.2d 1399 (9th Cir. 1990)) ("Alten").

-13-

Section 727(a)(3) is not a prescription of a "rigid standard of perfection" in record-keeping, but requires that the debtor "present sufficient written evidence which will enable his creditors reasonably to ascertain his present financial condition and to follow his business transactions for a reasonable period in the past." *First Nat'l Bank of Claude, Texas v. Williams (In re Williams)*, 62 B.R. 590, 593 (Bankr. N.D. Tex. 1986) (Akard, J.) (analogizing section 727(a)(3) to section 14(c)(2) of the old Bankruptcy Act). "It is a question in each instance of reasonableness in the particular circumstances. Complete disclosure is in every case a condition precedent to the granting of the discharge, and if such a disclosure is not possible without the keeping of books or records, then the absence" of books and records amounts to the failure described in section 727(a)(3). *Id*. The books and records need not be perfect but they should sufficiently identify transactions so that an intelligent inquiry can be made of the transactions. *Alten*, 958 F.2d at 1230. "The test is whether 'there [is] available written evidence made and preserved from which the present financial condition of the [debtor], and his business transactions for a reasonable period in the past may be ascertained.'" *Id*. There is no affirmative duty to, specifically, maintain a bank account,

-14-

but the records must sufficiently identify the debtor's financial transactions so that an intelligent inquiry can be made of them. *Ivey v. Anderson (In re Anderson)*, 2006 WL 995856, *3 (Bankr. M.D.N.C. 2006).

Section 727(a)(3) places an affirmative duty on the debtor to provide books and records "accurately documenting his financial affairs." *Structured Asset Services, L.L.C. v. Self (In re Self)*, 325 B.R. 224, 241 (Bankr. N.D. Ill. 2005). "[C]reditors are not required to accept a debtor's oral recitations or recollections of his transactions; rather, to qualify for a discharge in bankruptcy, a debtor is required to keep and produce written documentation of all such transactions." *Id*. "The completeness and accuracy of a debtor's records are to be determined on a case-by-case basis, considering the size and complexity of the debtor's financial situation." *Id*. The court has broad discretion in determining the sufficiency of the records provided and considerations for the court in making such a determination include the debtor's sophistication, educational background, business experience, business acumen, and personal financial structure. *Id*.

If the debtor fails to maintain and preserve adequate records, the debtor must present some justification for that

-15-

failure. *Alten*, 958 F.2d at 1230-31. "Depending upon the sophistication of the debtor and the extent of his activities, different record keeping practices are necessary." *Id*. at 1232. Where the debtor was an attorney, a "knowledgeable business and professional person who knew the value of maintaining adequate records," who had "generated substantial revenue and traveled extensively throughout the world, and was in the international investment and real estate consulting business for many years preceding" the bankrupt was held to a higher standard. *Id*. at 1231. In the *Alten* case, the debtor provided business and personal financial records for a four year period consisting only of three handwritten sheets of paper purporting to show income of approximately $380,000, a handwritten ledger showing dates and travel destinations, and income tax returns lacking supporting documentation for $120,000 in business expense deductions. *Id*. at 1228. "Often Debtors are poor record keepers, and the law does not require an impeccable system of bookkeeping. But by the same token, creditors should not be required to speculate about the financial condition of the debtor or hunt for the debtor's financial information." *In re Schifano*, 378 F.3d at 70; *see also Ivey v. Anderson (In re Anderson)*, 2006 WL 995856, \*3 (Bankr. M.D.N.C. 2006).

Mr. Hughes—a sophisticated businessman—admits he kept no records of his financial transactions. He kept no bank account, which would reflect his receipts and expenditures, nor did he keep any other record of such transactions. When asked by counsel for Cadle at the section 341 meeting whether there was any record that he could go to in order to determine what funds had passed through Mr. Hughes' hands, Mr. Hughes replied quite candidly that there is no record. There is no genuine issue of material fact in dispute concerning Mr. Hughes' netting approximately $5,000.00 a month and keeping no record of what happened to that $5,000.00 a month. Funds that potentially could have been property of the estate or the subject of voidable transfers have not been accounted for. Mr. Hughes has testified as to how those funds were spent, generally (on living expenses), but has provided no written record of how those funds were spent.

At the hearing on summary judgment, Mr. Hughes' counsel asserted that the reason Mr. Hughes chose to operate on a cash basis was because there were millions of dollars in judgments against him in connection with his former business operations. Mr. Hughes argues that he has met his burden under section 727(a)(3) because he has produced all the financial records that are in his possession: copies of cashiers checks, paycheck stubs,

and his joint tax returns with Mrs. Hughes.  Mr. Hughes' counsel,

at the hearing, asserted that tax returns are the quintessential

documents in a personal bankruptcy, citing *In re Dennis*, 330 F.3d

at 703, and that, therefore, by keeping and maintaining and

producing such returns, Mr. Hughes has met his burden under

section 727(a)(3).[2]  Although the Fifth Circuit in *In re Dennis*

does describe tax returns as the "quintessential documents" in a

personal bankruptcy case, those were not the only documents

produced by the debtors in that case: the court noted that "the

record contain[ed] numerous bank, payroll, and other records," as

well as the tax returns.  *Id*.  So the court in *In re Dennis* did

_____

[2]Mr. Hughes' counsel also points this court to an unreported
opinion by another bankruptcy judge in this district concerning
the personal bankruptcy of Mr. Hughes' former business partner,
Gordon Todd, asserting that the two men handled their affairs
identically.  The court has reviewed that opinion, however, and
there is a key fact that distinguishes Mr. Hughes' situation from
that of Mr. Todd: Although both men cashed their paychecks and
turned the funds over to their wives, Mrs. Todd, unlike the
situation with Mr. Hughes, deposited such funds into a separate
bank account in her name.  Only Mr. Todd's money went into that
account, despite it having Mrs. Todd's name on it.  Mr. Hughes,
by contrast, placed his money in a drawer in his house without
keeping any ledger or other record of the amounts deposited into
the drawer and removed from the drawer.  Accordingly, Mr. Todd's
situation is distinguishable from that of Mr. Hughes.  See
Findings of Fact and Conclusions of Law, *The Cadle Company v.
Todd*, Adversary No. 02-3114 (Bankr. N.D. Tex. Jan. 15, 2003).
Moreover, the suit against Mr. Todd involved sections 727(a)(2),
(a)(4), and (a)(5), so the question of the adequacy of Mr. Todd's
financial records was never at issue in that proceeding.  *See id.*
at 4.

not simply have the tax returns to rely on, but "numerous" other documents from which the debtor's financial condition could be determined, unlike the case at bar.[3]

It has been said many times that receiving a discharge in bankruptcy is a privilege, not a right. In order to have entitlement to that privilege, certain basic financial record keeping by the debtor is of paramount importance. Record keeping is required for parties in interest to be able to verify the accuracy of the sworn Schedules and SOFAs and to be certain that the disclosures are materially accurate. If there are insufficient records, then there is no way to have a check on the integrity of the Schedules and SOFAs. The integrity of the bankruptcy process depends upon there being an adequate paper trail. The consequence of failure to have adequate records must be the denial of a discharge.

## C. Is there a genuine issue of material fact as to whether Mr. Hughes knowingly and fraudulently made a false oath or account in connection with his bankruptcy case, such that his discharge

---

[3] Mr. Hughes also references *In re Pfeifle*, 154 Fed. Appx. 432 (5th Cir. 2005) for the proposition that he has met his burden by presenting his tax returns, but the court notes that, like *In re Dennis*, the debtors in *In re Pfeifle* presented tax returns as well as other documentation. The Fifth Circuit in *In re Pfeifle* also reiterated that the bankruptcy court has wide discretion in making the finding of whether documentation presented by a debtor is sufficient. *Id.* at *3. In this case, and under these circumstances, the documentation kept by Mr. Hughes is insufficient.

**should be denied pursuant to Section 727(a)(4)?**

Section 727(a)(4) provides that "[t]he court shall grant the debtor a discharge unless the debtor knowingly and fraudulently, in or in connection with the case (A) made a false oath or account; (B) presented or used a false claim; (C) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or (D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs."

In order to make a showing under 727(a)(4)(A), the plaintiff must show (1) that the debtor made a statement under oath; (2) that the statement was false; (3) that the debtor knew the statement was false; (4) that the debtor made the statement with fraudulent intent; and (5) that the statement related materially to the bankruptcy case. *Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 177-78 (5th Cir. 1992); *Sholdra v. Chilmark Financial LLP (In re Sholdra)*, 249 F.3d 380, 382 (5th Cir. 2001). "False oaths sufficient to justify the denial of discharge include a false statement or omission in the debtor's schedules or a false statement by the debtor at the examination

-20-

during the course of the proceedings." *In re Beaubouef*, 966 F.2d
at 178. The Fifth Circuit further opined that "the existence of
more than one falsehood, together with [the debtor's] failure to
take advantage of the opportunity to clear up all inconsistencies
and omissions when he filed his amended schedules, constituted
reckless indifference to the truth and, therefore, the requisite
intent to deceive." *Id.* In *Beaubouef*, even failure to list
ownership interest in an entity because that interest was
"worthless," was a material omission. The Fifth Circuit noted
that whether an omission is material is not a question of value
or whether the omission was detrimental to creditors, but a
question of whether the subject matter of a false oath bears a
relationship to the debtor's business transactions or estate, or
concerning the discovery of assets, business dealings, or the
existence and disposition of his property." *Id*.

     With regard to summary judgment, the fact that the debtor
amended his schedules does not create a genuine issue of material
fact that would preclude summary judgment. The amendments of
schedules "do not negate the fact that [the debtor] made
knowingly false oaths in his original schedules and statement of
financial affairs." *In re Sholdra*, 249 F.3d at 382. This is
even more true when the debtor files those amendments only after

the falsity of the original schedules and SOFAS was revealed. *Id.*

"It may be close to impossible to produce Schedules and SOFAs that contain no mistaken information, and bankruptcy papers with mistakes are not, alone, enough to bar a debtor's discharge." *The Cadle Company v. Geunther (In re Geunther)*, 333 B.R. 759, 767-68 (Bankr. N.D. Tex. 2005) "[T]he appropriate response is to offer amended information in a prompt fashion, and not to wait to amend the errors only after the insistence of one of their creditors." *Id*. at 768. In the *Geunther* case, the court found that the debtors' extended delay of over four months in amending their Schedules and SOFAs added up to a pattern of withholding information and fraudulent intent (the debtors had thwarted the discovery and disclosure process at every turn and had generally been recalcitrant or slow in providing information). *Id*.

When viewing summary judgment evidence, the court must examine it in a light most favorable to the nonmoving party. Although Cadle raises several troubling omissions and discrepancies with regard to Mr. Hughes' Schedules and Statement of Financial Affairs, the affidavits of Mr. Hughes, Mrs. Hughes, and Mr. Frazier, as well as the transcriptions of Mr. Hughes'

initial and continued section 341 meetings, raise genuine issues
of material fact as to whether such discrepancies are knowing and
fraudulent false oaths or accounts, or, rather, whether they are
genuine mistakes with no element of scienter behind them. And,
in fact, this court has already found in prior proceedings, that
insufficient evidence was presented to show that Mr. Hughes filed
the amendments to his Schedules and Statement of Financial
Affairs in bad faith.

Too, Cadle's summary judgment evidence alleged business
ventures of Mr. Hughes—namely, 4323 Beechwood, acquisition of
property with Mike Mullen, and Odin-Neptune—is not unchallenged
or so clear as to warrant the grant of judgment without benefit
of trial. Mr. Hughes' testimony at the section 341 meeting,
which is in the record, is enough to raise doubt as to the true
nature of his involvement in 4323 Beechwood. With regard to the
statements in the credit approval summary concerning the
acquisition of certain property by Mr. Hughes and Mr. Mullen, the
document is not an official record of such purchases, but merely
the statements of the understanding of an employee of a bank,
which may have been faulty or may have been inartfully drafted.
The court also notes that this is a credit approval for *HHPI*, for
which Mr. Hughes serves as manager, such that the bank employee

could have been using Mr. Hughes' name as a proxy for HHPI because Mr. Hughes was the business person at HHPI with whom the bank employee dealt. Indeed, Mr. and Mrs. Hughes both assert in their affidavits that it was HHPI and *not* Mr. Hughes that was involved in business arrangements with Mr. Mullen. More definite facts and documentation concerning these alleged purchases of property and the splitting of profits between Messrs. Hughes and Mullen would be necessary before this court could determine that there is no genuine issue of material fact as to whether Mr. Hughes was personally and intimately involved in such transactions (and not merely involved in them as an employee of HHPI). Similarly, Mr. and Mrs. Hughes assert that, notwithstanding what the Odin-Neptune Forms K-1 indicate, it is Mrs. Hughes, not Mr. Hughes, who owns this interest.

Accordingly, summary judgment is denied to Cadle with regard to section 727(a)(4), because genuine issues of material fact exist as to whether Mr. Hughes knowingly and fraudulently made false oaths or accounts in connection with his bankruptcy case. Cadle may present additional evidence at trial to support its contention that Mr. Hughes' discharge should be denied pursuant to section 727(a)(4), but for the reasons set forth herein, the court feels summary adjudication of this issue is inappropriate

-24-

at this time.

An order will be issued consistent with this opinion.

###END OF MEMORANDUM OPINION###